**NORTH CENTRAL AIRLINES, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

**Lake Central Airlines Employee Stockholder Group and Lake Central Airlines, Inc., Intervenors.**

**No. 14261.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 17, 1958.

Decided Jan. 29, 1959.

Certiorari Denied June 8, 1959.

See 79 S.Ct. 1285.

use a contrivance for 12 years on a steamboat if the boat should last that long." 2 Corbin, Contracts § 446 n. 30.

Mr. A. L. Wheeler, Washington, D. C., and Mr. Marvin Klitsner, Milwaukee, Wis., of the bar of the Supreme Court of Appeals of Wisconsin, pro hac vice, by special leave of Court, for petitioner. Mr. Emory N. Ellis, Jr., Washington, D. C., also entered an appearance for petitioner.

Mr. Robert L. Toomey, Atty., Civil Aeronautics Board, with whom Mr. Franklin M. Stone, Gen. Counsel, Civil Aeronautics Board, Mr. John H. Wanner, Associate Gen. Counsel, Civil Aeronautics Board, Mr. O. D. Ozment, Asst. Gen. Counsel, Litigation and Research, Civil Aeronautics Board, Mr. Ulrich V. Hoffmann, Atty., Civil Aeronautics Board, and Mr. Daniel M. Friedman, Atty., Department of Justice, were on the brief, for respondent. Mr. Morris Chertkov, Atty., Civil Aeronautics Board, also entered an appearance for respondent.

Mr. James L. Highsaw, Jr., Washington, D. C., with whom Clarence M. Mulholland, Toledo, Ohio, and Edward J. Hickey, Jr., Washington, D. C., were on the brief, for intervenor Lake Central Airlines, Inc.

Mr. Albert F. Grisard, Washington, D. C., was on the brief for intervenor Lake Central Airlines Employee Stockholder Group.

Before PRETTYMAN, Chief Judge, and WILBUR K. MILLER and WASHINGTON, Circuit Judges.

PRETTYMAN, Chief Judge.

This is an airline acquisition case, here on a petition to review an order of the Civil Aeronautics Board.[1] North Central Airlines, Inc. (which for brevity and clarity we shall call merely "North") sought to acquire a majority of the stock of Lake Central Airlines, Inc. (which we shall call "Lake"). The dispute has been

1. Sec. 408, Civil Aeronautics Act, 52 Stat. 1001 (1938), as amended, 49 U.S.C.A. § 488.

going on for a long time, at least six years, and has many complications and ramifications. We think we need not here go into that background. In September, 1952, North and the stockholders of Lake executed a contract whereby North was to acquire 96 per cent of the stock of Lake. The contract had to be approved by the Civil Aeronautics Board. The Board refused to approve it, and so the case is here.

The key concept in this controversy is "local service" or "feeder service". This is a type of airline operation certificated by the Board upon the "basic principle of fashioning a local service route system on the needs of a given trade area for short-haul and feeder service". The purpose is to provide short-haul services "geared to local needs and maximum development of local traffic" and concentrating the carriers' efforts "on operations in reasonably compact and homogeneous marketing areas." This is a clear and reasonable concept. It is in contradistinction to trunkline service, which operates to carry over long distances with a minimum of stops.

North is certified as a feeder or local service carrier in the area northwest of Chicago-Detroit. It extends north to the Canadian border and west to Grand Forks-Fargo-Omaha. It has stops at the big cities in the area—such as Milwaukee and Minneapolis-St. Paul—but also at La Crosse, Winona, Clintonville, Ironwood, Thief River Falls, Manitowoc, and many others of like size and character.

Lake is certified as a feeder or local service carrier in the area southeast of Chicago-Detroit. It thus adjoins North on the Chicago-Detroit line. It has stops in the big cities in the area—such as Cleveland, Buffalo and Cincinnati—but also at Erie, Youngstown, Mansfield, Lima, Logansport, Zanesville, Kokomo, Terre Haute, and others of like size and character.

The problem, from the Board's point of view, was whether the combination of these two local feeder services into one operation was inconsistent with the public interest. The Board has long been of the view that the two areas on either side of the Chicago-Detroit line are separate marketing areas and the local traffic requirements are dissimilar. It so decided in 1950 in a case known as the Parks Investigation Case.[2] Traffic tends to flow toward and into the big cities—especially Chicago—on feeder services, but not beyond such places on these services. The record in the present case discloses, the Board held, that "the trade centers of Chicago and Detroit serve as a dividing line between the two areas served by North Central and Lake Central, respectively, and that few local travelers proceed beyond these terminals via the local service routes involved." The thrust of the Board's opinion was that the combination of these two areas into one operation, which would then extend from Buffalo-Pittsburg to Grand Forks-Duluth, would violate the whole principle of local or feeder service and would clearly impinge upon trunkline certificates.

The Board found, as we have indicated, that there is little inter-area traffic between the two local feeder route services. It found that the combined area would be too big for the sort of concentrated local homogeny desired for local feeder certificates. In the Board's opinion feeder service should be centered in the area to be served and should be soundly integrated for that purpose. In terms of route mileage, number of cities served, density of population, and geographical area covered, the combined carriers would take on characteristics akin to a trunkline carrier and pose a threat to existing trunklines.

The Board said it wanted local feeder carriers to concentrate on local needs and local traffic problems, and it feared that the temptation to woo through traffic over the long distances and between the big cities which would be within the service area of a combined North-Lake operation, would be too insistent to be resisted. The Board found that each of

2. 11 C.A.B. 779.

these carriers, North and Lake, is in sizable proportions as a feeder service and each has sufficient room for development in its own area. The Board disagreed emphatically with the examiner in his view that the combination was necessary to preserve Lake, and the Board explained its view in detail, supported by the developing traffic figures.

The Board found that subsidy savings would be effected by the acquisition, if permitted, but that this saving was outweighed by the adverse effects on the overall public interest.

Counsel for North argues that the conclusion of the Board does not follow rationally from the ultimate findings; that the ultimate findings do not flow reasonably from the basic findings; and that the latter are not supported by the evidence as a whole. This is the skillful way of attacking agency orders, being a method of probing each link along the line of agency action. It would unduly prolong this opinion to discuss each of these asserted failures, but we have examined them and think none of them reveals a fatal defect.

■ The reasoning of the Board seems amply clear. We think the conclusion flows rationally from the ultimate findings, and these in turn rest upon ample basic findings. The latter seem to be supported by ample evidence. Of course there are disputes as to the inferences to be drawn from raw factual data, but it is not our function to draw inferences. Our function is to ascertain whether the inferences drawn by the administrative agency are within the reasonable boundaries prescribed by the facts. We think they are in this case.

With the assistance of supplemental memoranda from counsel for the parties, the court has explored several questions relating to the procedure before the Board, but we find no reversible error in these respects.

■ North urges that the language of Section 408(b) of the statute raises a presumption in favor of mergers of air carriers. Be that as it may, any such presumption could hardly survive the considered judgment of the Board, as expressed in a case such as the present one, that a particular proposal is not consistent with the public interest.

■ North says the Board was arbitrary and failed to make sufficient findings when it departed from established norms. For example, North says the proposition that the size of a proposed merged system is immaterial to approval of the merger is an established rule. It refers to a number of cases. But "size" is a relative term, and its importance depends upon circumstances. Because the Board found the size of a merged system immaterial in one case cannot make it an immaterial factor in all cases and under all circumstances. And North says the Board established in the Arizona-Monarch Merger Case [3] that feeder routes need not be complementary in order to be merged. It says that in the present case the Board, inconsistently, held the trade areas of the two airlines must be complementary. But we think North does not accurately assay either holding. In Arizona-Monarch the Board said that two feeder systems need not be geographically complementary; that is, a merger need not have the effect of increasing the intra-system long hauls. In the present case the Board pointed out, as one feature of the proposed merged system, the lack of inter-area local traffic. But in Arizona-Monarch the Board stressed other circumstances. In the instant case the lack of this traffic was one of several critical factors. We find no inconsistency. These problems cannot be solved by a mathematical computation. Judgment necessarily enters into each one, and the Congress has given the agency power to exercise that judgment. As was properly pointed out in the Southwest-West Coast Merger Case,[4] the Board is concerned principally with the national air route pattern. This court can and should insure that the agency stays within the bounds of reason and outside the realm of caprice, but the court cannot

3. 11 C.A.B. 246 (1950).

4. 14 C.A.B. 356, 358 (1951).

substitute its own judgment as to what would or would not be inconsistent with the public interest in a proposed merger. We think the judgment of the Board in this case was not arbitrary and was not a departure from established norms which would have bound it.

Affirmed.